UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---

|  |  |
|---|---|
| SAMUEL HILDENBRAND, On Behalf of Himself and All Others Similarly Situated, | Civil Action No. 07-1886(JAG) **(Consolidated)** |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| W HOLDING COMPANY, INC., et al., | |
| Defendants. | **<u>DEMAND FOR JURY TRIAL</u>** |

---

**TO THE HONORABLE COURT:**

NOW COME Lead Plaintiffs the Rivera Group, comprised of Félix Rivera, José A. Nicolao, Fundación Ríos Pasarell, Inc. and Efren E. Moreno (collectively, "Lead Plaintiffs" or the "Rivera Group"), through their undersigned counsel, and respectfully allege and pray:

Lead Plaintiffs have alleged the following based upon the investigation of Lead Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by W Holding Co., Inc. ("W Holding" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of W Holding, current and former borrowers, court transcripts from related litigations and media reports about the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal class action on behalf of purchasers of the publicly traded securities of W Holding between April 24, 2006 and June 26, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       Over a period of more than two years, Defendants carried out a fraudulent scheme which inflated the Company's earnings and assets by at least $105 million. Through the Company's primary operating subsidiary, Westernbank Puerto Rico ("Westernbank" or the "Bank"), the Company conducted asset-based lending activities that relied upon nonexistent collateral for the repayment of its loans. The Company has now admitted that, due to unreported asset impairment losses that existed throughout the Class Period, its financial statements for the periods ending September 2006, December 2006 and March 2007 were materially false and will be restated. The Company has only provided approximate information concerning the timing and amounts of

previously unreported losses concerning a single borrower, Inyx Inc. ("Inyx").[1]  When final information concerning the restatement is disclosed, it is highly likely that additional losses concerning numerous borrowers of the Company's asset-based lending division will be reported.

3.     As detailed herein, Defendants' knowledge of the scheme, or reckless disregard for the truth of their public statements, for years prior to the Company's June 2007 public disclosure of impairment losses in connection with loans made to Inyx is irrefutable.  Westernbank's lending officer, who was intimately familiar with the lending transactions between Inyx and Westernbank, has since admitted that the Company had access to and was aware of severe problems with the collateral supporting the Inyx loans long before its public disclosure of the problems in June 2007. Yet the Company failed to properly account for that loan in its financial statements.

4.     Throughout the Class Period, Defendants issued numerous press releases and filings with the SEC which portrayed the Company's asset quality as strong by representing that the Company's asset-based lending activities, though of high risk, were subject to a rigorous review process that resulted in the proper disclosure of loan delinquencies and appropriate measures to obtain recoveries in the event of borrower defaults.  However, nothing could have been further from the truth.  Subsequent to the Class Period, the Company's Board ousted all of Westernbank's asset-based lending division's senior officers and appointed an independent senior credit committee to manage the division's activities.  The committee took supervisory control of the division and

---

[1]     Inyx is a manufacturer of pharmaceutical products with operating subsidiaries in the U.S. and U.K.  Two of Inyx's U.S. affiliates, Inyx USA, Ltd. and Exaeris, Inc., filed for Chapter 11 relief in United States Bankruptcy Court District of Delaware in July 2007.  Similarly, Inyx's direct and indirect U.K. subsidiaries, Inyx Europe, Inyx Pharma and Ashton Pharmaceutical, sought bankruptcy relief in the U.K. courts in late June 2007.  Inyx and the Company have also filed suits against each other in Federal District Court in New York and Puerto Rico, asserting claims related to facts underlying Lead Plaintiffs' claims.

performed an overall credit and operational review.  Based on the undisclosed activities of the asset-based lending division during the Class Period, W Holding's Board concluded that the Company's system of internal controls was ineffective and included material weaknesses.

5.      On June 26, 2007, W Holding belatedly disclosed that "one of its larger asset-based loans" was impaired and stated that the Company was unable to make a determination as to the amount or range of amounts of any collateral deficiency, impairment charge or future cash expenditures with respect to such charge.  However, on a preliminary basis, Defendants estimated that the collateral deficiency was at least $80 million.  In response to the Company's announcement, the price of W Holding stock dropped from $5.01 per share to $3.14 per share on extremely heavy trading volume and continued to decline, falling to $2.64 per share on June 29, 2007, representing a 66% decline from the Class Period high closing price of $7.93 per share reached on or about May 5, 2006.  Since that announcement, the impairment charge has grown from an estimate of $80 million to an estimate of $105 million.  Moreover, since the quarter ended June 30, 2007, the Company has not made any of its required filings with the SEC and has been subjected to delisting procedures by both the NASDAQ and the NYSE.  The Company's common shares have continued to languish just above a price of $1 per share.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination

of materially false and misleading information, occurred in substantial part in this District and W Holding conducts business in this District.

9.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Lead Plaintiffs purchased the securities of W Holding during the Class Period and have been damaged thereby.  Lead Plaintiffs' certifications have been previously filed with the Court and are hereby incorporated by reference.

11.     Defendant W Holding is a corporation organized under the laws of Puerto Rico with its principal executive offices located at 19 West McKinley Street, Mayaguez, Puerto Rico 00681. W Holding operates as the holding company for Westernbank, a commercial bank operating in Puerto Rico which offers an array of business and consumer financial products and services, including banking, trust and brokerage services.

12.     Defendant Frank C. Stipes ("Stipes") was, throughout the Class Period, W Holding's Chief Executive Officer ("CEO") and the Board Chairman of both the Company and Westernbank. On March 29, 2007, Stipes also assumed the duties of President and CEO of Westernbank.  During the Class Period, Stipes signed and verified the Company's false and misleading reports filed with the SEC.  From 2003 through 2006, Stipes reaped more than $4.6 million in bonuses, which were paid based on the "perception" that the Company's reported earnings were fairly stated.

13.     Defendant Ricardo Hernandez ("Hernandez") was, from the inception of the Class Period, W Holding's Corporate Comptroller.  In July 2005, Hernandez was promoted to the position of Chief Financial Officer ("CFO").  During the Class Period, Hernandez signed and/or assisted in the preparation of the Company's false and misleading reports filed with the SEC.  Effective June

13, 2006, Hernandez "resigned" from his position as CFO to "spend more time with his family and pursue other personal interests."  From 2003 through 2006, Hernandez reaped approximately $1.8 million in bonuses, which were paid based on the "perception" that the Company's reported earnings were fairly stated.

14.     Defendant Freddy Perez Maldonado ("Maldonado") was W Holding's CFO until July of 2005, when he was promoted to the position of President and Chief Investments Officer.  During the Class Period, Maldonado signed and verified the Company's false and misleading reports filed with the SEC.  From 2003 through 2005, Maldonado reaped approximately $2.3 million in bonuses, which were paid based on the "perception" that the Company's reported earnings were fairly stated.[2]

15.     Defendant Norberto Rivera ("Rivera"), Vice President and Westernbank Comptroller, was promoted to the position of the Company's Chief Accounting Officer ("CAO") and Comptroller on June 14, 2006.  During the Class Period, Rivera signed and/or assisted in the preparation of the Company's false and misleading reports filed with the SEC.  During 2006, Rivera received a $166,000 bonus, which was paid based on the "perception" that the Company's reported earnings were fairly stated.[3]

16.     Defendant Westernbank is the Company's wholly-owned commercial bank subsidiary.  Pursuant to W Holding's filings with the SEC, the Company's business is conducted primarily through Westernbank.  Defendant Westernbank is primarily liable for the violations of law alleged herein as it was a direct and knowing source of W Holding's materially false and misleading statements during the Class Period.

---

[2]     W Holding did not disclose the amount of Defendant Maldonado's 2006 bonus.

[3]     W Holding did not disclose the amount of Defendant Rivera's bonuses prior to 2006.

17.     Defendant Jose M. Biaggi ("Biaggi") was, from July 12, 2005 until he resigned on March 29, 2007, the President and CEO of Westernbank.  Biaggi assisted in the preparation of the Company's false and misleading reports filed with the SEC and is primarily liable for the violations of law alleged herein as he was a direct and knowing source of W Holding's materially false and misleading statements during the Class Period.  During 2005 and 2006, Biaggi received bonuses of approximately $1.0 million, which were paid based on the "perception" that the Company's reported earnings were fairly stated.

18.     The Defendants named in ¶¶12-15 and 17 above are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants, as senior executive officers and/or directors of W Holding, were privy to confidential and proprietary information concerning W Holding, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning W Holding, as discussed in detail below.  Because of their positions with W Holding, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the

Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of W Holding's business.

20. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to W Holding's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of W Holding's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of W Holding publicly traded securities by disseminating materially false and misleading statements and/or concealing material

adverse facts.  The scheme: (i) deceived the investing public regarding W Holding's business, operations and management and the intrinsic value of W Holding securities; and (ii) caused Lead Plaintiffs and members of the Class to purchase W Holding publicly traded securities at artificially inflated prices.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

23.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the securities of W Holding between April 24, 2006 and June 26, 2007, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, W Holding stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by W Holding or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

26.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of W Holding;

(c)     whether the prices of W Holding's publicly traded securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**Westernbank's Asset-Based Lending Division**

29.     W Holding is a financial holding company operating primarily through its wholly owned commercial bank subsidiary, Westernbank.  The Bank operates the Westernbank Business Credit division ("Business Credit"), which conducts asset-based lending activities secured principally by real estate, accounts receivable, inventory and equipment, in addition to five other

business lines or divisions.[4]  The focus of Lead Plaintiffs' allegations concerns the Company's asset-based lending activities of Business Credit.[5]

30.     Over the past four years, W Holding has pursued an aggressive growth strategy by expanding its products and services, resulting in an increase in its asset base of nearly 49% (increasing to $17.2 billion at the end of 2006 from $11.5 billion at the end of 2003), fueled by growth in the Company's loan portfolio which grew by more than $4.0 billion or 85% over that same period.  This growth strategy allowed Defendants to tout the Company as the second largest commercial bank in Puerto Rico, based on total assets, at the end of 2006.

31.     In June 2001, Westernbank entered the asset-based lending business with its acquisition of the asset-based lending portfolio of the Puerto Rico branch of Congress Credit Corporation for $163.8 million.  ***Commercial asset-based lending is a much more risky proposition than the Company's traditional residential mortgage lending business.***  The Business Credit division often lent to borrowers who could not borrow anywhere else, with the expectation that the Bank charged higher fees and interest margins as compensation for the higher risk.  During the third quarter of 2006, Defendants reported that yields on Business Credit's loans exceeded the average yield of all the Company's earning assets by more than 360 basis points (9.84% compared to

---

[4]     In addition to Business Credit, Westernbank operates retail banking branches and four other divisions: Westernbank International Division; Westernbank Trust Division; Expresso of Westernbank; and Westernbank International Trade Services.

[5]     Asset-based lending is used to describe commercial lending to businesses using assets not normally used in other loans.  Typically, these loans are tied to inventory, accounts receivable, machinery and equipment, trademarks, or intellectual property.  This type of lending is usually done when the normal routes of raising funds, such as the capital markets or normal unsecured or mortgage secured bank lending is not possible.  This is usually because the potential borrower is in dire financial status.  ***Thus, asset based lending can be compared to subprime lending.***  It is usually accompanied by high interest rates, and can be very lucrative for the lender.  *See* http://en.wikipedia.org/wiki/Asset-based_lending.  [Emphasis added.]

- 10 -

6.23%).[6] Defendants were therefore highly motivated to grow this line of business and maintain its appearance of high profitability.

32.     By December 2002, Business Credit's outstanding loans had grown to $427.7 million. Through December 31, 2006, Business Credit's loan portfolio was $1.46 billion, or nearly 17% of the Company's total loans, increasing from about 14% of the Company's loan portfolio at the end of 2003.  In fact, the Company's asset-based lending portfolio has grown at a faster rate in each year since 2003 than the rate that the rest of the Company's loan portfolio has grown.  During 2005, Business Credit's loans grew by 51.61% when compared to its loans outstanding at the end of 2004. The rate of growth for the Company's loan portfolio, excluding asset-based lending, was 28.68% during 2005.  ***In 2005, Business Credit's loans increased by $428 million - - about 23% of that increase, or $97.5 million, is attributable to asset-based lending to Inyx.***

33.     The following chart illustrates the growth in Business Credit's total loans outstanding at December 31, 2002-2006, with comparisons to the division's reserves for possible losses and actual loan charge-offs:

---

[6]     The actual premium for Business Credit yields is even higher that the 360 points that can be discerned from the Company's published results since the Company's average earning asset base includes those premium yields in its calculations.





**Defendants Ignored Numerous Red Flags By Failing To Disclose Problems With the Inyx Loans Prior to June 2007[7]**

### *Red Flag #1: The Bank's Knowledge of Questionable "Sales"*

34.    The Company has now admitted that it incurred at least $105 million in impairment charges related to the Inyx loans.  Many of these loans were financed based on sales invoices submitted to the Bank by Inyx and subsequently approved by the Bank for financing.  The first asset-

---

[7]    Unless otherwise indicated, the following allegations concerning Business Credit's lending activities with Inyx are taken from the testimony of Gabriel Montanez ("Montanez"), an assistant vice president and underwriter employed by the Business Credit division of Westernbank, and the testimony of Michael Middup ("Middup"), an employee of Ernst &Young, provided at a July 11, 2007 hearing in a bankruptcy proceeding brought by two of Inyx's affiliates.  Montanez was the underwriter (or credit officer) for Westernbank and had personal knowledge of the loan transaction(s) between Business Credit and Inyx.  Middup is a forensic investigator hired by the bankruptcy administrators of Inyx's U.K. affiliates.  In the course of his investigation, Middup examined original business records and correspondence related to these matters.

based loan to Inyx by Westernbank closed on March 31, 2005.  The loan was for $46 million and consisted, in part, of a revolving credit limit secured by Inyx's inventories and accounts receivable. As is typical of these loan transactions, the Bank closely monitored the value of these assets by obtaining evidence of daily sales, inventory purchases, and cash payments as well as monthly reconciliation reports.  Montanez testified that the Bank had unfettered access to these records throughout 2005 and most of 2006.  In addition to these original business records, Monatanez testified that the Bank conducted regular audits of Inyx and its affiliates on a rotating basis every 90 to 120 days.  During the course of these audits, Inyx's bank statements, cash reconciliations, inventory reports, and accounts receivable agings, among other information, were examined.

35.     Based on this extensive and ongoing monitoring process, Defendants knew or recklessly disregarded by at least some point early in 2005 that the collateral, particularly the accounts receivable balances reported by Inyx, was actually worth only a fraction of the value of the loan outstanding.  Thus, the true value of Inyx's inventories and accounts receivables were known to Defendants and the loans to Inyx should have been written down years prior to the Company's June 2007 disclosure of the impairment of Inyx loans.

36.     Indeed, based on the testimony in connection with the bankruptcy proceedings, certain of Inyx's sales invoices submitted to W Holding by Inyx for financing should have been rejected as appropriate collateral by the Bank.  Specifically, according to testimony of Michael Middup, the forensic investigator acting on behalf of U.K. administrators, certain of the sales invoices submitted to W Holding by Inyx as support for the financing were actually "pre-billing" or "development" invoices that were never approved by a customer for payment.  Middup explained that in the normal course of Inyx's business, "customer quotes" for sales are obtained and "signed by the customer."  The signed quotes are then attached to the invoice as evidence of the sale.  Middup

- 13 -

testified that in the case of these development invoices "some" were never sent to the customer. These "pre-billing" invoices without customer signatures submitted to the Bank for financing were obvious red flags that Inyx was attempting accelerate its sales process in order to obtain financing and should have put the Bank on notice that its collateral was impaired.  Indeed, in November 2006, Inyx Executive Vice President, Jay Green, informed Mike Vasquez, President of the Business Credit Division, that $37.6 million of pre-billings in Inyx's accounts receivable, which were part of the collateral base securing Inyx's revolving line of credit, were going to be written off.  Montaneez candidly acknowledged during his testimony in the bankruptcy proceeding that Inyx's request "raised a red flag that maybe some of the receivables assigned to the bank were not gonna be collected . . .".  Rather than declaring an event of default under the terms of the loan agreements when informed of this write-off, Westernbank waived the covenants in its loan agreement with Inyx that allowed it to declare a default, continued to loan additional monies to Inyx, and failed to reserve for or publicly disclose the $37.6 million in "pre-billing" receivables Defendants knew were at risk of never being collected.

37.    Corroborating information concerning the "pre-billing" invoices has also been obtained from a former Inyx financial executive interviewed during the course of Lead Plaintiffs' investigation, Confidential Informant 1 ("CI 1").[8]  This former financial executive of Inyx recalled that it was in response to "financial pressure" that "Jack [Kachkar] and Jay [Green] got desperate and looked for more 'R&D work,' and went out on a limb with the invoices." CI 1 explained that Kachkar and Green actively marketed Inyx's research and development capabilities to pharmaceutical companies.  As part of this campaign, ***beginning in about the September – October***

---

[8]     CI 1 was employed by Inyx from March 2005 to December 2005.  CI 1, in the course of his normal duties, had extensive contact with Inyx's U.S. and U.K. operations.

*2005 timeframe, Green insisted that Inyx send invoices to those companies with which Inyx had oral discussions concerning R&D work, even though there was no formal contract.* In other words, without a formal contract, Green invoiced potential customers for work that had not been performed, and probably would not be performed for 6 to 9 months in the future, if at all. When CI 1 objected to Kachkar about this practice, Kachkar told him to shut up or he would be fired.

38.    CI 1 further explained that Inyx initially sought financing from Westernbank in order to acquire certain business assets of Aventis PR, including a drug manufacturing plant in Manatí, Puerto Rico. CI 1 explained that the acquisition deal and its financing from Business Credit were predicated on a specified volume of post-acquisition product orders to be forthcoming from Aventis. CI 1 stated that soon after Inyx acquired the Manatí plant, Aventis began, in about April 2005, to reduce the volume of product it was ordering from Inyx. CI 1 recalled that in response, Inyx tried to "up the Aventis commitment," by invoicing for more product than was ordered and shipped. In fact, Aventis did not pay those invoices, but Westernbank released funds as though they were legitimate.

39.    Another tactic employed by Inyx to make up for lost sales volume from Aventis was the acquisition of another facility in Manchester, England. Apparently undeterred by the weakness in Inyx's business due to the downturn in Aventis sales, Westernbank approved funding for this acquisition as well. According to CI 1, the Manchester acquisition was scheduled to close in July 2005, however, prior to the closing it became known that the plant in Manchester was contaminated with mold spores and would require costly and lengthy remediation efforts before it went online. According to Montanez's testimony, Inyx's credit limit was increased to $82.5 million in August 2005 in order to close the Manchester acquisition.

40.    In addition to the Bank's failure to properly monitor the "pre-billing" and Aventis invoicing, CI 1 also stated that in the June – July 2005 timeframe, Inyx was waiting for shipments of

CFC gas.  CI 1 explained that a company must obtain a government allotment before being permitted to receive such shipments.  Since Inyx was awaiting its allotment, the CFC shipment was held up at the port of entry.  It turned out that with reduced product orders, Inyx was scheduled to receive more gas than it could use and began to sell gas futures to use up the allotment.  As before, Green insisted that invoices be sent to purchasers even though Inyx did not possess the gas and could not ship it.  According to CI 1, although the invoices did not represent legitimate accounts receivable, the Bank released funds for them.  The gas futures invoices were not legitimate receivables and should have alerted the Bank to question the collateral values supporting its Inyx loans during 2005 based on the Company's review of Inyx's sales records and accounts receivable aging reports.

### *Red Flag #2: The Bank's Audits of Inyx Operations Uncover Questionable Billings*

41.     Pursuant to the loan documentation, the Company performed quarterly audits of Inyx.  These audits, among other things, were designed to verify the value of the collateral pledged to the Company by Inyx.  These audits had already uncovered problems with Westernbank's loan to Inyx even before the beginning of the Class Period.   Indeed, according to a complaint filed by Westernbank in July 2007, as early as March 13, 2006, W Holding representatives had identified inconsistencies in invoices and product development contracts provided by Inyx to the Company.  In addition, on August 1, 2006, Westernbank representatives participated in a telephone conference call with Steven Hadley, Inyx's President, and Inyx Executive Vice President Colin Hunter to discuss the aging of Inyx's accounts receivable and the "alarming amount of those accounts receivable that had shifted to the ineligible and the critical column."

42.     Thereafter, in October 2006, the Company was advised by its own auditors that they were unable to complete the audit of the collateral because Inyx refused to provide full and complete information.  Nevertheless, in November 2006, even after being advised that Inyx was writing off $37.6 million in "pre-billing" receivables collateralizing Westernbank's loans, at Inyx's request,

Westernbank agreed to waive covenants in the loan documentation that would have allowed Westernbank to declare an event default, and instead continued lending money to Inyx. Moreover, Westernbank did not reserve for or disclose the $37.6 million in write-offs by Inyx.

### *Red Flag #3: The Bank's Knowledge of Inyx's False Claims of Refinancing*

43.     Also beginning in September 2006, Inyx began to make a series of wild representations that it would be able to pay off the loan by receiving funds from a variety of sources, none of which ever materialized. For example, at one point Inyx informed the Company that the loan would be paid off by a member of Lybia's Qaddafi family through one of Lybia's central banks. Upon checking with that bank, the Company quickly learned that the purported payoff transaction was pure fiction. Yet, the Company failed to set appropriate reserves for the loan.

44.     By April 2007, the Company's auditors still had not been provided with information needed to value the accounts receivable. In fact, the Company did not have bank statements, cash reconciliations, accounts receivable agings, inventory reports, or the majority of the other documents needed for a proper evaluation. However, the Company's financial statements falsely indicated that the loan was properly collateralized and appropriate reserves were not established.

45.     In May of 2007, the Company was informed by Inyx's then CFO, David Zinn, that at least $82.5 million of the accounts receivable securing the Company's loans to Inyx would "probably" not be collected. According to Gabriel Montanez, during several conversations with Zinn throughout the month of May, Zinn confirmed the "inaccuracies" that the Company already knew existed in Inyx's accounts receivable. Nevertheless, the Company took no action to report the obvious impairment of its Inyx loans or to set loss reserves for the receivable shortfall.

**Materially False and Misleading
Statements Issued During the Class Period**

46.     Defendant W Holding operates as the holding company for Westernbank, a commercial bank operating in Puerto Rico, which offers an array of business and consumer financial products and services including banking, trust and brokerage services.

47.     As detailed further herein, throughout the Class Period, W Holding reported artificially inflated financial results due to an improper accounting scheme.  In particular, W Holding failed to timely write-down loans to Inyx, despite the fact that Defendants knew that the prospect of being paid back was not likely.  Moreover, the Defendants failed to set adequate reserves for the Inyx loans, even through they knew that the value of the collateral securing the loans was overstated.  By failing to properly write-down and reserve against the Inyx loans, W Holding's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and, therefore, were materially false and misleading.

48.     The Class Period commences on April 24, 2006.  On that date, W Holding filed its Form 10-K for the year ended December 31, 2005 with the SEC, which was signed by Defendants Stipes, Maldonado and Hernandez (the "2005 10-K").  The 2005 10-K included W Holding's financial statements for the year ended December 31, 2005, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the 2005 10-K represented that:

- The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America and banking industry practices.

- ***The allowance for loan losses is based on ongoing quarterly assessments*** of the probable estimated losses inherent in the loan portfolio.  The Company follows a systematic methodology to establish and evaluate the adequacy of the allowance for loan losses.  This methodology consists of several key elements. ***Larger commercial and construction loans that exhibit probable or observed credit weaknesses are subject to individual review.***  Where appropriate, allowances are allocated to individual loans based on management's estimate of the borrower's ability to repay

the loan given the availability of collateral, other sources of cash flow and legal options available to the Company.

- *Included in the review of individual loans are those that are impaired as provided in Statement of Financial Accounting Standards ("SFAS") No. 114*, Accounting by Creditors for Impairment of a Loan, as amended. Any allowances for impaired loans are measured based on the present value of expected future cash flows discounted at the loans' effective interest rate or fair value of the underlying collateral. *Commercial business, commercial real estate and construction loans, exceeding $500,000, are individually evaluated for impairment.* Other loans are evaluated in homogeneous groups and collectively evaluated for impairment. Loans that are recorded at fair value or at the lower of cost or fair value are not evaluated for impairment. Impaired loans for which the discounted cash flows or collateral value exceeds its carrying value do not require an allowance. The Company evaluates the collectibility of both principal and interest when assessing the need for loss accrual. [Emphasis added.]

49.     Regarding loan delinquencies, charge-offs, and provisions for possible loan losses,

the 2005 10-K stated in pertinent part:

The accrual of interest on loans is discontinued when there is a clear indication that the borrower's cash flow may not be sufficient to meet payments as they become due, but in no event is it recognized after a borrower is 90 days in arrears on payments of principal or interest. When a loan is placed on nonaccrual status, all previously accrued and unpaid interest is charged against income and the loan is accounted for on the cash method thereafter.

*          *          *

The 2005 provision for loan losses was $31.0 million, a decrease of $5.7 million or 15.51% from 2004. Net charge-offs during 2005 amounted to $18.7 million, which when subtracted from the provision for loan losses of $31.0 million resulted in a net increase in the allowance for loan losses of $12.3 million. The provision for the year ended 2004 was $36.7 million, an increase of $9.6 million from the year ended December 31, 2003. Net charge-offs during 2004 amounted to $18.2 million, which when subtracted from the provision for loan losses of $36.7 million resulted in a net increase in the allowance for loan losses of $18.5 million.

The provision for loan losses for Westernbank Business Credit division accounted for $22.4 million or 72.33% of the total provision for loan losses for the year ended December 31, 2005, while for year 2004, it accounted for $6.0 million or 16.33% of the total provision for loan losses. The increase of $16.4 million in the provision for loan losses for Westernbank Business Credit division is mainly attributable to two factors; first, an increase in the division loss ratio as a result of a $5.3 million partial charge-off of one loan that was acquired in the original purchased loan portfolio of this division on June 15, 2001. The remaining outstanding principal balance of this

- 19 -

loan at December 31, 2005, is $10.1 million, with a specific valuation allowance of $6.8 million.   Second, the increase in the specific reserves of two loans of the division loan portfolio during the fourth quarter of year 2005.   Outstanding principal balances on these loans were $10.1 million (as explained above) and $14.1 million at December 31, 2005, with specific reserves of $6.8 million and $4.8 million, respectively.

50.   The statements referenced above in ¶¶48-49 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts:

(a)   that by November 2005, impaired loans to Inyx, reported as part of Westernbank's Business Credit Division, had grown to an outstanding balance of at least $97.5 million comprised of both term loans and "revolver" loans secured by Inyx's accounts receivables. According to CI 1, a former senior financial executive with Inyx, by November 2005, the Company was aware that the loans would never be repaid and were secured by "phantom" accounts receivable that Defendants knew or recklessly disregarded were not adequate collateral.   CI 1 explained that, beginning in September 2005, in order to offset business downturns, Inyx began forwarding to Westernbank invoices for sales transactions which had never occurred.   According to CI 1, Westernbank, though it was in possession of evidence to the contrary, never questioned the transactions but continued to lend money to Inyx based on 80% of the face value of the invoices in order to inflate it earnings and assets.   A Westernbank assistant Vice President, Gabriel Montanez, provided testimony during a July 2007 bankruptcy hearing concerning an Inyx affiliate, confirming that Westernbank was in regular receipt of invoices, customer remittances, and other documentation which detailed the build-up of unpaid "phantom" receivables on Inyx's books throughout 2005 and 2006.   Montanez's testimony  also confirms that although Westernbank regularly conducted audits of Inyx's operations each 90-120 days, the Bank regularly approved additional Inyx financing during 2005, when a vast majority of the "phantom" receivables were recorded and submitted to Westernbank for financing;

(b)      that the Company's financial results during the Class Period were artificially inflated due to the Company's failure to provide loan loss reserves for impaired loans.  W Holding has now admitted that it recorded an impairment charge of $97.6 million for the nine months ended September 30, 2007 and $91.4 million for the six months ended June 30, 2007 for the Inyx loans.  At the end of the quarter ended September 30, 2007, Westernbank charged-off $91.4 million of the Inyx loans;

(c)      that the Company improperly delayed the recognition of its impaired assets in order to inflate its reported income, including but not limited to interest income and loan fees and the general component of the allowance for loan losses;

(d)      that the "regulatory capital" the Company claimed throughout the Class Period was similarly overstated;

(e)      that the quality of the Company's reported assets was poor, contrary to the Company's public statements, a fact that Defendants concealed by consistently understating the Company's nonperforming loans including, but not limited to, the loans to Inyx.  Another example of these practices is taken from the statement of Confidential Informant 2 ("CI 2"), a borrower through Westernbank's Business Credit division during the Class Period.  According to CI 2, Westernbank continued to advance funds to CI 2's business in order to clear past due interest amounts and allow the Company to continue to accrue income on the loans.  CI 2 explained that Westernbank's balance sheet presented CI 2's loan as current, when in fact the loan was not current, was severely impaired, and not properly reserved;

(f)      that the Company's system of internal control was not functioning and included material weaknesses.  The Company has now admitted that the review of its internal controls revealed numerous material weaknesses particularly in Westernbank's Business Credit

division.  The control deficiencies required the Company's Board to form a specially appointed senior credit management committee composed of officers outside of the asset-based lending division in order to take supervisory control of the division and perform an overall credit and operational review.  As a result of the review, the committee made comprehensive changes to the operations of the division; and

(g)     the Company's "book value" per share was materially overstated; and as a result of (a)-(f) above, and as more fully described in ¶¶75-79 below, the Company's published financial statements violated U.S. GAAP.  The Company has now admitted that the financial statements of the Company for the year ended December 31, 2006 and for the quarters ended September 30, 2006 and March 31, 2007 (the "Restated Periods"), were materially false and misleading and will need to be restated to recognize the impact of adjustments resulting from an estimated $105 million aggregate Inyx loan impairment over such periods.  However, the final amount and timing for such adjustments have yet to be disclosed.

51.     On May 3, 2006, W Holding issued a press release announcing its financial results for its first quarter, the period ending March 31, 2006.  For the first quarter, the Company reported net income of $35.4 million or $0.16 per share.  With respect to loan delinquencies, charge-offs and provision for possible loan losses the press release stated, in pertinent part, as follows:

> Net loans charged-off to average total loans ratio improved by 4 basis points during the first quarter of 2006, to 0.16% from 0.20% for the same quarter in year 2005 and by 11 basis points from 0.27% reported for the year ended December 31, 2005.
>
> W Holding's combined delinquency on all loan portfolios for the categories of 60 days and over at March 31, 2006, was 0.65%, below the Company's benchmark of 1%.  On a linked quarter comparison, the Company's combined delinquency on all portfolios for the categories of 60 days and over improved by 7 basis points, from 0.72% at December 31, 2005.
>
> The delinquency ratio on the commercial real estate-mortgage and commercial, industrial and agricultural loan ("Commercial and C&I") and construction loan portfolios for the categories of 60 days and over was 0.66% (less than 1%) at March

31, 2006. On a linked quarter comparison, the Company's delinquency ratio on the commercial loan portfolio for the categories of 60 days and over improved 19 basis points, from 0.85% at December 31, 2005.

\*        \*        \*

The provision for possible loan losses amounted to $7.0 million for the first quarter of 2006, up by $1.0 million, from $6.0 million for the same period in 2005. The increase in the provision for loan losses is attributable to the overall growth in the Company's loan portfolio, mainly those of its Commercial and C&I loans. Commercial and C&I loans grew to $5.5 billion at March 31, 2006, an increase of $182.6 million or 3.46%, when compared to December 31, 2005. On a year-to-year basis, the Commercial and C&I loan portfolio grew $1.2 billion or 28.48%, from $4.2 billion at March 31, 2005. ***Westernbank Business Credit loan portfolio grew to $1.4 billion at March 31, 2006, an increase of $89.3 million or 6.59%, when compared to December 31, 2005, and an increase of $294.7 million or 27.83%, when compared to March 31, 2005. The average yield of Westernbank Business Credit loan portfolio at March 31, 2006, was 8.65%.***

\*        \*        \*

At March 31, 2006, the allowance for possible loan losses was 137.67% of total non-performing loans (reserve coverage). Of the total allowance of $96.3 million, $15.1 million is the Company's specific allowance and the remaining $81.2 million is a general allowance.

52.    On or about May 5, 2006, W Holding common stock closed at $7.93 per share, a Class Period high.

53.    On or about May 10, 2006, W Holding filed its March 31, 2006 Form 10-Q with the SEC, which was signed by Defendants Stipes and Hernandez and repeated W Holding's previously announced financial results for the quarter. The Form 10-Q included W Holding's financial statements for the quarter ended March 31, 2006, which were represented to have been presented in conformity with U.S. GAAP. In addition, the Form 10-Q represented that:

- ***The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America*** ("GAAP") and banking industry practices. ***The accompanying unaudited Condensed Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")***. In the opinion of management, the unaudited Condensed Consolidated Financial Statements include all adjustments (which consist of normal recurring accruals) necessary to present fairly the

- 23 -

consolidated financial condition as of March 31, 2006 and December 31, 2005, and the results of operations, changes in stockholders' equity, comprehensive income, and cash flows for the three months ended March 31, 2006 and 2005. All significant intercompany balances and transactions have been eliminated in the accompanying unaudited condensed consolidated financial statements. Certain information and footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to SEC rules and regulations. ***Management believes that the disclosures made are adequate to make the information presented not misleading.***

- ***Loans are classified as impaired or not impaired in accordance with SFAS No. 114.*** A loan is impaired when, based on current information and events, it is probable that Westernbank will be unable to collect the scheduled payments of principal or interest when due, according to the contractual terms of the agreement.

- ***Westernbank measures the impairment of a loan based on the present value of expected future cash flows discounted at the loan's effective interest rate, or as a practical expedient, at the observable market price of the loan or the fair value of the collateral, if the loan is collateral dependent.***

- ***Significant loans (those exceeding $500,000) are individually evaluated for impairment.*** Large groups of small balance, homogeneous loans are collectively evaluated for impairment; loans that are recorded at fair value or at the lower of cost or market are not evaluated for impairment. The portfolios of mortgage and consumer loans are considered homogeneous and are evaluated collectively for impairment. [Emphasis added.]

54.     The statements referenced above in ¶¶51 and 53 were each materially false and misleading for the reasons stated in ¶50.

55.     On June 13, 2006, W Holding issued a press release announcing that its CFO, Defendant Hernandez, had "resigned to spend more time with his family and pursue personal interests." In addition, the Company announced that Defendant Rivera was appointed to the position of CAO.

56.     On July 20, 2006, W Holding issued a press release announcing its financial results for its second quarter of 2006, the period ending June 30, 2006. For the second quarter, the Company reported net income of $21.7 million or $0.08 per share. Regarding loan delinquencies, charge-offs, and provisions for possible loan losses the press release stated in pertinent part:

The Company's combined delinquency on all portfolios for the categories of 60 days and over continues to be below the Company's benchmark of 1% for both periods. The combined delinquency was 0.96% at June 30, 2006, an increase of 31 basis points when compared to 0.65% at June 30, 2005. The increase in the combined delinquency ratio arises from delinquent loans of the Commercial and C&I and construction loan portfolios, mainly in loans collateralized by real estate properties.

*        *        *

The provision for possible loan losses amounted to $18.3 million for the second quarter of 2006, up by $13.3 million, from $5.0 million for the same period in 2005. For the six months ended June 30, 2006, the provision for possible loan losses amounted to $25.3 million, up by $14.3 million, from $11.0 million for the six months ended June 30, 2005. The allowance for possible loan losses reached $108.5 million as of June 30, 2006.

*        *        *

The provision for loan losses for the asset based lending division increased by $23.2 million and $25.0 million, for the three and six months ended June 30, 2006, when compared to same periods in 2005. Such increase is mainly attributable to two factors. First, the increase in the division portfolio from $1.12 billion at June 30, 2005, to $1.26 billion at December 31, 2005, to $1.42 billion at June 30, 2006. Second, the classification of three loans of the Division's portfolio with outstanding principal balances of $50.4 million, $40.6 million and $9.8 million at June 30, 2006. At June 30, 2006, these loans required valuation allowances as follows; $16.2 million for the $50.4 million loan, $8.1 million for the $40.6 million loan and $2.2 million for the $9.8 million loan. These loans are current but have shortfalls in the financial conditions of the borrowers. The average yield of Westernbank Business Credit loan portfolio at June 30, 2006, was 8.88%.

*        *        *

Net loans charged-off in the second quarter of 2006 were $6.1 million or 0.30% (annualized) to average loans, an increase of $2.6 million or 73.92%, when compared to $3.5 million or 0.20% (annualized) to average loans for the same period in 2005. The increase in loans charged-off for the second quarter of 2006 when compared to the same quarter in 2005, is mainly attributed to an increase of $3.0 million in Commercial and C&I loans charged-off. Such increase is principally due to a $2.0 million additional partial charge-off of one reserved loan of the Company's asset based lending division that was acquired in the original purchased loan portfolio in 2001, as previously explained.

*        *        *

Non-performing loans stand at $90.1 million or 1.09% of the total loan portfolio at June 30, 2006, an increase of $26.1 million or 40.82%, when compared to $64.0 million or 0.81% of the total loan portfolio at December 31, 2005. This increase is

mainly attributed to two loans of the Company's asset based lending division, with outstanding principal balances of $16.5 million and $14.1 million at June 30, 2006. Both loans are current but have shortfalls in the financial conditions of the borrowers. At June 30, 2006, the $16.5 million and the $14.1 million loans have a valuation allowance of $16.2 million and $4.9 million, respectively. During the six months ended June 30, 2006, five loans that were in non-performing status at December 31, 2005, all of them with the same borrower and an aggregate outstanding principal balance of 8.4 million, were paid-off.

At June 30, 2006, the allowance for possible loan losses was 120.35% of total non-performing loans (reserve coverage). Of the total allowance of $108.5 million, $38.5 million is the Company's specific allowance and the remaining $70.0 million is a general allowance.

57.     On or about August 17, 2006, W Holding filed its June 30, 2006 Form 10-Q with the SEC, which was signed by Defendants Stipes and Rivera and repeated W Holding's previously announced financial results for the quarter. The Form 10-Q included W Holding's financial statements for the quarter ended June 30, 2006, which were represented to have been presented in conformity with U.S. GAAP. In addition, the Form 10-Q represented the following:

- ***The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America*** ("GAAP") and banking industry practices. ***The accompanying unaudited Condensed Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")***. In the opinion of management, the unaudited Condensed Consolidated Financial Statements include all adjustments (which consist of normal recurring accruals) necessary to present fairly the consolidated financial condition as of June 30, 2006 and December 31, 2005, the results of operations for the three and six months ended June 30, 2006 and 2005, and changes in stockholders' equity, comprehensive income, and cash flows for the six months ended June 30, 2006 and 2005. All significant intercompany balances and transactions have been eliminated in the accompanying unaudited condensed consolidated financial statements. Certain information and footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to SEC rules and regulations. ***Management believes that the disclosures made are adequate to make the information presented not misleading.***

- ***Loans are classified as impaired or not impaired in accordance with SFAS No. 114.*** A loan is impaired when, based on current information and events, it is probable that Westernbank will be unable to collect the scheduled payments of principal or interest when due, according to the contractual terms of the agreement.

- ***Westernbank measures the impairment of a loan based on the present value of expected future cash flows discounted at the loan's effective interest rate, or*** as a practical expedient, at the observable market price of the loan or ***the fair value of the collateral, if the loan is collateral dependent.***

- ***Significant loans (those exceeding $500,000) are individually evaluated for impairment.*** Large groups of small balance, homogeneous loans are collectively evaluated for impairment; loans that are recorded at fair value or at the lower of cost or market are not evaluated for impairment. The portfolios of mortgage and consumer loans are considered homogeneous and are evaluated collectively for impairment. [Emphasis added.]

58.     The statements referenced above in ¶¶56 and 57 were each materially false and misleading for the reasons stated in ¶50.

59.     On November 8, 2006, W Holding issued a press release announcing its financial results for the third quarter of 2006, the period ending September 30, 2006. For the third quarter, the Company reported net income of $25.5 million or $0.10 per share. Regarding loan delinquencies, charge-offs, and provisions for possible loan losses the press release stated in pertinent part:

The Company's combined delinquency on all portfolios for the categories of 60 days and over was 0.70% (less than 1%) at September 30, 2006, an improvement of 4 basis points when compared to 0.74% (less than 1%) at September 30, 2005. The decrease in the combined delinquency ratio arises from a decrease in delinquent loans of the Commercial and C&I and construction loan portfolios, mainly in loans collateralized by real estate properties.

*       *       *

The provision for possible loan losses amounted to $11.3 million for the third quarter of 2006, up by $5.3 million, from $6.0 million for the same period in 2005. For the nine months ended September 30, 2006, the provision for possible loan losses amounted to $36.6 million, up by $19.6 million, from $17.0 million for the nine months ended September 30, 2005. The allowance for possible loan losses reached $115.0 million as of September 30, 2006. The increase in the provision for loan losses for both periods is attributable to the following factors: first, the overall growth in the Company's loan portfolio, mainly those of its Commercial and C&I loans; and second, to higher non-performing loans and net loans charged-off during the period, principally in the loans portfolio of the Company's asset-based lending division.

*       *       *

- 27 -

The provision for loan losses for the asset-based lending division increased by $2.3 million and $26.8 million, for the three and nine months ended September 30, 2006, when compared to the same periods in 2005.  Such increases are mainly attributable to two factors: first, the increase in the Division's loan portfolio from $1.25 billion at September 30, 2005, to $1.26 billion at December 31, 2005, to $1.44 billion at September 30, 2006; and second, the increase in classified loans of the Division's loans portfolio.  During the nine months ended September 30, 2006, the Company classified three loans of the Division's loan portfolio with outstanding principal balances of $51.6 million, $40.3 million and $9.8 million at September 30, 2006. These loans required valuation allowances as follows: $16.2 million for the $51.6 million loan, $10.8 million for the $40.3 million loan and $3.0 million for the $9.8 million loan.  These loans are current but have shortfalls in the financial conditions of the borrowers.  The average yield of Westernbank Business Credit Division's loan portfolio at September 30, 2006, was 9.84%.

\*       \*       \*

At September 30, 2006, the allowance for possible loan losses was 88.90% of total non-performing loans (reserve coverage).  Of the total allowance of $115.0 million, $43.8 million is the Company's specific allowance and the remaining $71.2 million is a general allowance.

\*       \*       \*

For the nine months ended September 30, 2006, net loan charge-offs amounted to $14.0 million or 0.23% (annualized) to average loans, an increase of $3.5 million or 33.74%, when compared to $10.5 million or 0.21% (annualized) to average loans in 2005.  The increase in loans charged-off for the nine months ended September 30, 2006, when compared to the same period in 2005, is mainly attributed to an increase of $6.6 million in Commercial and C&I loans charged-off.  Such increase is principally due to additional partial charge-offs for an aggregate amount of $5.3 million on one reserved loan of the Company's asset based lending division, as explained before.

\*       \*       \*

Non-performing loans amounted to $129.3 million or 1.51% of the total loan portfolio at September 30, 2006, an increase of $65.3 million, when compared to $64.0 million or 0.81% of the total loan portfolio at December 31, 2005.  This increase is mainly attributed to two loans of the Company's asset based lending division, with outstanding principal balances of $51.6 million and $14.3 million at September 30, 2006.  Both loans are current but have shortfalls in the financial conditions of the borrowers.  At September 30, 2006, the $51.6 million and the $14.3 million loans have a valuation allowance of $16.2 million and $5.0 million, respectively.  During the nine months ended September 30, 2006, five loans that were in non-performing status at December 31, 2005, all of them with the same

borrower and an aggregate outstanding principal balance of $8.4 million, were collected.

At September 30, 2006, the allowance for possible loan losses was 88.90% of total non-performing loans (reserve coverage).  Of the total allowance of $115.0 million, $43.8 million is the Company's specific allowance and the remaining $71.2 million is a general allowance.

60.     On or about November 9, 2006, W Holding filed its September 30, 2006 Form 10-Q with the SEC, which was signed by Defendants Stipes and Rivera and repeated W Holding's previously announced financial results for the quarter.  The Form 10-Q included W Holding's financial statements for the quarter ended September 30, 2006, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the Form 10-Q represented the following:

- *The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America* ("GAAP") and banking industry practices. *The accompanying unaudited Condensed Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")*.  In the opinion of management, the unaudited Condensed Consolidated Financial Statements include all adjustments (which consist of normal recurring accruals) necessary to present fairly the consolidated financial condition as of September 30, 2006 and December 31, 2005, the consolidated results of operations for the three and nine months ended September 30, 2006 and 2005, and the consolidated changes in stockholders' equity, comprehensive income, and cash flows for the nine months ended September 30, 2006 and 2005.  All significant intercompany balances and transactions have been eliminated in the accompanying unaudited condensed consolidated financial statements.  Certain information and footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to SEC rules and regulations.  *Management believes that the disclosures made are adequate to make the information presented not misleading.*

- *Loans are classified as impaired or not impaired in accordance with SFAS No. 114.*  A loan is impaired when, based on current information and events, it is probable that Westernbank will be unable to collect the scheduled payments of principal or interest when due, according to the contractual terms of the agreement.

- *Westernbank measures the impairment of a loan based on the present value of expected future cash flows discounted at the loan's effective interest rate, or* as a practical expedient, at the observable market price of the loan or *the fair value of the collateral, if the loan is collateral dependent.*

- ***Significant loans (those exceeding $500,000) are individually evaluated for impairment.*** Large groups of small balance, homogeneous loans are collectively evaluated for impairment; loans that are recorded at fair value or at the lower of cost or market are not evaluated for impairment. The portfolios of mortgage and consumer loans are considered homogeneous and are evaluated collectively for impairment. [Emphasis added.]

61.    The statements referenced above in ¶¶59 and 60 were each materially false and misleading for the reasons stated in ¶50 and because they failed to disclose and misrepresented the following material adverse facts:

(a)    that in September 2006, loans to Inyx had increased to at least $110 million. The Company has admitted that its financial statements for the quarter ended September 30, 2006 were materially misstated and would be restated to recognize the impact of adjustments resulting from an estimated $105 million aggregate Inyx loan impairment;

(b)    that in October 2006, the Company's auditors had determined that they were unable to substantiate the value of the collaterized receivables supporting the loans to Inyx;

(c)    that in November 2006, Inyx had informed the President of Westernbank's Business Credit Division, Miguel Vazquez, that at least $37.5 million of accounts receivable securing Inyx loans would be written off, yet the Company failed to increase its reserve for the Inyx loans.

62.    On January 30, 2007, W Holding issued a press release announcing its financial results for its fourth quarter and year ended December 31, 2006. The press release characterized W Holding's asset quality as "strong." Regarding loan delinquencies, charge-offs, and provisions for possible loan losses, the press release stated in pertinent part:

W Holding's asset quality continues to be strong in spite of the Company's continued loan portfolio growth, as measured by the Company's ratios of net loan charge-offs to average total loans, provision for loan losses to net loans charged-off and reserves to total loans.

*       *       *

- 30 -

The Company's combined delinquency on all portfolios for the categories of 60 days and over was 0.66% (less than 1%) at December 31, 2006, an improvement of 6 basis points when compared to 0.72% (less than 1%) at December 31, 2005. The improvement in the combined delinquency ratio arises from a reduction in delinquent loans of the Commercial and C&I and construction loan portfolios.

\*        \*        \*

The provision for possible loan losses increased by $14.0 million, up to $28.0 million for the fourth quarter of 2006, when compared to the same quarter in 2005. For the year ended December 31, 2006, the provision for possible loan losses amounted to $64.6 million, up by $33.6 million, from $31.0 million for the year ended December 31, 2005. The allowance for possible loan losses reached $126.8 million as of December 31, 2006. The increase in the provision for loan losses for both periods is attributable to the following factors: first, the overall growth in the Company's loan portfolio, mainly those of its Commercial and C&I loans; and second, to higher non-performing loans, net loans charged-off and specific reserves during the period, principally in the loan portfolio of the Company's asset-based lending division.

\*        \*        \*

The provision for loan losses for the asset-based lending division increased by $4.6 million and $35.1 million, for the quarter and the year ended December 31, 2006, when compared to the same periods in 2005. Such increases are mainly attributable to two factors: first, the increase in the Division's loan portfolio from $1.26 billion at December 31, 2005, to $1.46 billion at December 31, 2006; and second, the increase in classified loans of the Division's loans portfolio. During the year ended December 31, 2006, the Company classified three loans of the Division's loan portfolio with outstanding principal balances of $44.9 million, $40.5 million and $7.3 million at December 31, 2006. These loans required valuation allowances as follows: $11.4 million for the $44.9 million loan (after a partial charge-off of $7.5 million), $15.2 million for the $40.5 million loan and $2.5 million for the $7.3 million loan (after a partial charge-off of $3.0 million). All these loans are current and have not missed their payment schedules but have shortfalls in the collaterals and in the financial condition of the borrowers.

\*        \*        \*

Net loans charged-off in the fourth quarter of 2006 were $16.1 million or 0.74% (annualized) to average loans, an increase of $7.9 million, when compared to $8.2 million or 0.43% (annualized) to average loans for the same period in 2005. The increase in loans charged-off for the fourth quarter of 2006 when compared to the same quarter in 2005 is mainly attributed to an increase of $7.7 million in Commercial and C&I loans charged-off. Such increase is principally due to partial charge-offs of $7.5 million and $3.0 million on two loans of the Company's asset-based lending division with outstanding principal balances after charge-offs of $44.9 million and $7.3 million, respectively, at December 31, 2006. Both loans are current.

\*      \*      \*

Non-performing loans amounted to $165.8 million or 1.89% of the total loan portfolio at December 31, 2006, an increase of $101.8 million, when compared to $64.0 million or 0.81% (less than 1%) of the total loan portfolio at December 31, 2005.  The increase in non-performing loans for the year ended December 31, 2006, when compared to the same period in 2005, is mainly due to an increase of $99.3 million in non-performing loans, mainly attributed to four loans of the Company's asset based lending division, with outstanding principal balances of $44.9 million, $40.5 million, $14.2 million and $7.3 million at December 31, 2006.  These loans are current and have not missed their payment schedules but have shortfalls in the collaterals and in the financial condition of the borrowers.  These loans required valuation allowances as follows: $11.4 million for the $44.9 million loan, $15.2 million for the $40.5 million loan, $4.7 million for the $14.2 loan and $2.5 million for the $7.3 million loan.  During the year ended December 31, 2006, five loans related to one single borrower that were in non-performing status at December 31, 2005, with an aggregate outstanding principal balance of $8.4 million, were collected.

At December 31, 2006, the allowance for possible loan losses was 76.50% of total non-performing loans (reserve coverage).  Of the total allowance of $126.8 million, $40.2 million is the Company's specific allowance and the remaining $86.6 million is a general allowance.

63.    On or about February 27, 2007, W Holding filed its December 31, 2006 Form 10-K with the SEC, which was signed by Defendants Stipes, Maldonado and Rivera and repeated W Holding's previously announced financial results for the quarter (the "2006 10-K").  The 2006 10-K included W Holding's financial statements for the year ended December 31, 2006, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the 2006 10-K represented the following:

- ***The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America*** ("GAAP") and banking industry practices.

- ***The allowance for loan losses is based on ongoing quarterly assessments*** of the probable estimated losses inherent in the loan portfolio.  The Company follows a systematic methodology to establish and evaluate the adequacy of the allowance for loan losses.  This methodology consists of several key elements. ***Larger commercial and construction loans that exhibit probable or observed credit weaknesses are subject to individual review.***  Where appropriate, allowances are allocated to individual loans based on management's estimate of the borrower's ability to repay

- 32 -

the loan given the availability of collateral, other sources of cash flow and legal options available to the Company.

- Included in the review of individual loans are those that are impaired as provided in Statement of Financial Accounting Standards ("SFAS") No. 114, Accounting by Creditors for Impairment of a Loan, as amended. Any allowances for impaired loans are measured based on the present value of expected future cash flows discounted at the loans' effective interest rate or fair value of the underlying collateral. Commercial business, commercial real estate and construction loans, exceeding $500,000, are individually evaluated for impairment. Other loans are evaluated in homogeneous groups and collectively evaluated for impairment. Loans that are recorded at fair value or at the lower of cost or fair value are not evaluated for impairment. Impaired loans for which the discounted cash flows or collateral value exceeds its carrying value do not require an allowance. The Company evaluates the collectibility of both principal and interest when assessing the need for loss accrual. [Emphasis added.]

64.     The statements referenced above in ¶¶62 and 63 were each materially false and misleading for the reasons stated in ¶¶50 and 61.

65.     On March 29, 2007, W Holding issued a press release announcing that Defendant Biaggi resigned from his position as President and CEO of Westernbank.

66.     On May 1, 2007, W Holding issued a press release announcing its financial results for its first quarter of 2007, the period ending March 31, 2007. For the first quarter, the Company reported net income of $28.7 million or $0.12 per share. Regarding loan delinquencies, charge-offs, and provisions for possible loan losses, the press release stated in pertinent part:

The Company's combined delinquency on all portfolios for the categories of 60 days and over was 0.72% (less than 1%) at March 31, 2007, a slight increase of 6 basis points when compared to 0.66% (less than 1%) at December 31, 2006. The slight increase in the combined delinquency ratio is the result of an increase in delinquent loans of the Commercial and C&I and construction loan portfolios, mainly in loans collateralized by real estate properties.

*          *          *

The provision for possible loan losses increased by $9.0 million, up to $16.0 million for the first quarter of 2007, when compared to the same quarter in 2006. The allowance for possible loan losses reached $136.9 million as of March 31, 2007. The increase in the provision for loan losses for the first quarter of 2007 is mainly attributable to two factors: first, the overall growth in the Company's loan portfolio,

- 33 -

mainly those of its Commercial and C&I loans; and second, to higher non-performing loans and net loans charged-off.

\*      \*      \*

The provision for loan losses for the asset-based lending division increased by $3.8 million for the quarter ended March 31, 2007, when compared to the same period in 2006. Such increase is mainly attributable to two factors: first, the increase in the Division's loan portfolio from $1.35 billion at March 31, 2006, to $1.41 billion at March 31, 2007, and second, the increase in classified loans of the Division's loans portfolio. During the quarter ended March 31, 2007, the Company classified two loans of the Division's loan portfolio with outstanding principal balances of $11.4 million and $6.8 million at March 31, 2007. These loans required valuation allowances as follows: $1.9 million for the $11.4 million loan and $2.0 million for the $6.8 million loan. These loans have shortfalls in the collaterals and in the financial condition of the borrowers.

\*      \*      \*

Net loans charged-off in the first quarter of 2007 were $6.0 million or 0.27% (annualized) to average loans, an increase of $2.8 million, when compared to $3.1 million or 0.16% (annualized) to average loans for the same period in 2006. The increase in net loans charged-off when compared to same quarter in 2006 was due to the following two factors; first, an increase in consumer loans charged-off of $1.4 million and 63.56%, and second, to a decrease in total recoveries of loans previously charged-off of $1.3 million or 59.02%. The increase in consumer loans charged-off was primarily due to an increase of $948,000 in loans charged-off by the Expresso of Westernbank division. Loans charged-off by the Expresso of Westernbank Division during the first quarter of year 2007 were $2.6 million, compared to $1.7 million for the same quarter in year 2006.

Non-performing loans amounted to $191.8 million or 2.12% of the total loan portfolio at March 31, 2007, an increase of $26.0 million, when compared to $165.8 million or 1.89% of the total loan portfolio at December 31, 2006. The increase in non-performing loans is mainly due to two loans of the Company's asset based lending division, with outstanding principal balances of $11.4 million and $6.8 million at March 31, 2007. These loans have shortfalls in the collaterals and in the financial condition of the borrowers. These loans required valuation allowances at March 31, 2007 as follows: $1.9 million for the $11.4 million loan and $2.0 million for the $6.8 million loan.

At March 31, 2007, the allowance for possible loan losses was 71.35% of total non-performing loans (reserve coverage). Most of the Company's non-performing loans are collateralized with real estate properties, accounts receivable, inventories and equipment. Of the total allowance of $136.9 million, $45.0 million is the Company's specific allowance and the remaining $91.9 million is the general allowance component.

67.    On May 8, 2007, W Holding filed its March 31, 2007 Form 10-Q with the SEC, which was signed by Defendants Stipes and Rivera and repeated W Holding's previously announced financial results for the quarter.  The Form 10-Q included W Holding's financial statements for the quarter ended March 31, 2007, which were represented to have been presented in conformity with U.S. GAAP.  In addition, the Form 10-Q contained the following false statements:

- *The accounting and reporting policies of the Company conform to accounting principles generally accepted in the United States of America* ("GAAP") and banking industry practices. *The accompanying unaudited Condensed Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")*.  In the opinion of management, the unaudited Condensed Consolidated Financial Statements include all adjustments (which consist of normal recurring accruals) necessary to present fairly the consolidated financial condition as of March 31, 2007 and December 31, 2006, and the consolidated results of operations, changes in stockholders' equity, comprehensive income, and cash flows for the three months ended March 31, 2007 and 2006.  All significant intercompany balances and transactions have been eliminated in the accompanying unaudited condensed consolidated financial statements.  Certain information and footnote disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to SEC rules and regulations.  *Management believes that the disclosures made are adequate to make the information presented not misleading.*

- *Loans are classified as impaired or not impaired in accordance with SFAS No. 114*.  A loan is impaired when, based on current information and events, it is probable that Westernbank will be unable to collect the scheduled payments of principal or interest when due, according to the contractual terms of the agreement.

- *Westernbank measures the impairment of a loan based on the present value of expected future cash flows discounted at the loan's effective interest rate, or* as a practical expedient, at the observable market price of the loan or *the fair value of the collateral, if the loan is collateral dependent*.

- *Significant loans (those exceeding $500,000) are individually evaluated for impairment.*  Large groups of small balance, homogeneous loans are collectively evaluated for impairment; loans that are recorded at fair value or at the lower of cost or market are not evaluated for impairment.  The portfolios of mortgage and consumer loans are considered homogeneous and are evaluated collectively for impairment.  [Emphasis added.]

68.     The statements referenced above in ¶¶66 and 67 were each materially false and misleading for the reasons stated in ¶¶50 and 61 and because they failed to disclose and misrepresented the following material adverse facts:

(a)     that by March 2007, loans to Inyx totaled at least $120 million. The Company has admitted that its financial statements for the quarter ended March 31, 2007 were materially false and misleading and would be restated to recognize the impact of adjustments resulting from an estimated $105 million aggregate Inyx loan impairment;

(b)     that by March 2007, at the latest, the Company was aware that Inyx's representations that a refinancing of Westernbank's loans by a succession of identified lenders, including a member of Lybia's Qadaffi family through one of Libya's central banks, could not be verified;

(c)     that in April 2007, Westernbank's internal auditors, examining Inyx's U.K. facility, reported that they had not been provided with information needed to value Inyx's accounts receivable;

(d)     that in May 2007, the Company was told by David Zinn, Inyx's then-CFO, that an estimated $82.5 million of accounts receivable securing Westernbank's loans to Inyx would not be collected.

69.     Then, on June 26, 2007, W Holding filed a Form 8-K with the SEC, which reported that the Company had determined that "one of its larger asset-based loans" was impaired. The Form 8-K stated, in pertinent part, as follows:

> On June 19, 2007, **W Holding Company, Inc.**, the bank holding company of Westernbank Puerto Rico, **determined that one of its larger asset-based loans originated by its asset-based lending division is impaired. The Company also determined there is a significant collateral deficiency with respect to this impaired loan.**

At this time, the Company is unable to make a determination as to the amount or range of amounts of any collateral deficiency, impairment charge or future cash expenditures with respect to such charge. However, ***on a preliminary basis, management believes the collateral deficiency to be at least $80 million***. The Company is currently in the process of evaluating the loan, the existing and possible potential new collateral and the loan guaranty to determine the financial impact, if any, of this loan impairment.

In reviewing the circumstances of the impairment discussed above under Item 2.06, ***the Audit Committee*** of the Board of Directors ***has decided to have an independent firm*** retained to ***review*** the impaired loan as well as ***the complete asset-based lending portfolio and the asset based lending division's systems of internal controls.*** [Emphasis added.]

70.     In response to the Company's announcement, the price of W Holding stock dropped

from $5.01 per share to $3.14 per share on extremely heavy trading volume and continued to decline,

falling to $2.64 per share on June 29, 2007, representing a 66% decline from the Class Period high of

$7.93 per share reached on or about May 5, 2006.

71.     On June 27, 2007, *American Banker* reported:

W Holding Co. disclosed problems with one of its large corporate loans Tuesday, reinforcing credit quality's place at the top of a long list of concerns besetting Puerto Rico's banks.

Virtually all of the island's banking companies have reported credit deterioration in recent quarters, after turmoil in 2005 caused by massive earnings restatements by three companies that had incorrectly accounted for interest-only securities. Those problems are still not resolved, and a recession in Puerto Rico has put additional stress on consumer portfolios.

The troubles appear to be spreading to commercial lending. W Holding, which has $17.5 billion of assets, said in a filing with the Securities and Exchange Commission that ***one of its "larger" asset-based loans is impaired - and that the loan has "a significant collateral deficiency."***

The Mayaguez company said it has engaged an independent firm to review its entire $1.4 billion portfolio of asset-based loans.

***Bain Slack, an analyst at KBW Inc.'s Keefe, Bruyette & Woods Inc., said the portfolio review could prove more serious than the current impairment.***

- 37 -

*The review "implies that there is more to come," Mr. Slack said. "It's a serious move to have to bring in an independent firm to review your system of internal controls for a whole department."*

First-quarter interest income at W Holding's asset-based division, Westernbank Business Credit, rose 19% from a year earlier, to $27.4 million. The division's portfolio constituted 15.4% of the company's $9.1 billion loan book, up from about 11% a year earlier.

*Anthony Polini, an analyst with Soleil Securities Group Inc., downgraded W Holding to "sell" from "hold" on Tuesday.*

"Loan growth has remained at very high levels throughout the recent economic downturn in Puerto Rico, even as problem assets continue to rise," Mr. Polini wrote in a report explaining the downgrade. "The company's growth appears to be unbridled and *the company's risk management capabilities are suspect, in our opinion*."

*W Holding's shares opened sharply lower Tuesday morning and closed down 37.3% on volume almost 12 times its average*. Shares of other large Puerto Rican lenders also declined: Popular Inc. fell 2.5%, and First BanCorp fell 2.4%.

Though W Holding is generally thought to be one of the most aggressive lenders on the island, investors seem to be betting that other companies will have similar troubles.

*   *   *

"We need to see the updated financials to see how that's going to play out, but I would imagine they are challenged," said Mr. Slack, who along with Mr. Polini is one of the few research analysts still covering the island's banks.

W Holding's filing raised more questions than it answered.

The company was "unable to make a determination as to the amount or range of amounts of any collateral deficiency, impairment charge, or future cash expenditures with respect to such charge," it said. "However, on a preliminary basis, management believes the collateral deficiency to be at least $80 million."

W Holding did not disclose the borrower, the size of the loan, the type of collateral, or whether it had reserved for loss. A spokesman did not return phone calls seeking comment. [Emphasis added.]

## Events Subsequent to the Class Period

72.     On August 15, 2007 the Company was notified by NASDAQ that certain of the

Company's preferred securities are subject to delisting from NASDAQ due to the Company's failure

to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (the "June 2007 10-Q") in a timely manner.  Subsequently, on April 2, 2008, W Holding was notified by the NYSE that delisting procedures of the Company's common shares could be commenced based on the Company's failure to file it annual report on Form 10-K for the year ended December 31, 2007 (the "2007 10-K").  As of the date of this filing, W Holding remains delinquent in filing its June 2007 10-Q, its Form 10-Q for the quarter ended September 30, 2007 and its 2007 10-K.

73.     On November 7, 2007, Westernbank filed amended Call Reports for the periods ended June 30, and September 30, 2007 (the "Amended Reports").[9]  In the Amended Reports, Westernbank reported a net loss of $45.9 million for the nine months ended September 30, 2007 and $65.0 million for the six months ended June 30, 2007.  For the three months ended September 30, 2007, Westernbank had a net income of $19.1 million.  The provision for loan losses amounted to $174.4 million for the nine months ended September 30, 2007; $163.4 million for the six months ended June 30, 2007; and $11.0 million for the three months ended September 30, 2007.  The provision for loan losses includes an impairment charge of $97.6 million for the nine months ended September 30, 2007 and $91.4 million for the six months ended June 30, 2007 for the Inyx, Inc. loan.  At the end of the quarter ended September 30, 2007, Westernbank charged-off $91.4 million of the Inyx loan.  Westernbank's allowance for loan losses was $179.2 million at September 30, 2007 and $264.1 million at June 30, 2007.

74.     On February 5, 2008, the Company concluded that the financial statements of the Company for the year ended December 31, 2006 and for the quarters ended September 30, 2006 and March 31, 2007 (the "Restated Periods"), will need to be restated to recognize the impact of

---

[9]     Call Reports are required quarterly financial statement filings made to banking regulators.

adjustments resulting from an estimated $105 million aggregate Inyx loan impairment over such periods. However, the final amount and timing for such adjustments were still being determined. Through the date of this filing, the Company has not published or filed with the SEC restated financial statements for the Inyx loan impairment. The Company further concluded that the financial statements and related reports of its independent registered public accountant included in previous SEC filings for the Restated Periods could no longer be relied upon. W Holding's press release announcing the restatement stated in pertinent part as follows:

> As previously reported on the Company's Current Report on Form 8-K filed on June 25, 2007, the Company announced that it had determined that one of its largest asset-based loans (the "Inyx loan") was impaired and that there was a significant collateral deficiency with respect to this loan. The Company believes that it was materially misled by this borrower when it applied for this loan and in numerous subsequent communications, and accordingly the Company is pursuing claims for fraud against Inyx and its principal(s) in litigation that is ongoing.

> In May 2007, the asset-based lending division was placed under the direct management and supervision of a specially appointed senior credit management committee composed of officers outside of the asset-based lending division. This committee took supervisory control of the division and performed an overall credit and operational review. The committee also made comprehensive changes to the operations of the division.

> The Company's Audit Committee of the Board of Directors (the "Audit Committee") reviewed the circumstances of the Inyx loan impairment and engaged outside advisors to review the Inyx loan, the Bank's asset-based lending division loan portfolio, and the system of internal control at the division. The Audit Committee's review is substantially complete.

> The Company has concluded that there were certain matters in the Company's internal controls requiring corrective action which, individually or in combination, would be considered material weaknesses in the Company's system of internal control. The Company's review of internal controls is ongoing.

> The Company also has concluded that the unaudited quarterly financial statements for the quarters ended September 30, 2006 and March 31, 2007 and the audited financial statements for the year ended December 31, 2006 will need to be restated for the correction of an error to recognize the impact of adjustments resulting from the $105 million aggregate Inyx loan impairment discussed below over such periods. The total amount of these adjustments, which includes, but is not limited to the allocation of the Inyx loan impairment over such periods, as well as the impact on

- 40 -

income taxes, interest income and loan fees and the general component of the allowance for loan losses, is still being calculated.  Because of this pending restatement, the referenced financial statements (and corresponding reports of our independent registered public accountant) should no longer be relied upon.  The Company is unable at this time to estimate when it will complete the restatement.

As of December 31, 2007, Westernbank has recorded an aggregate of $105 million of impairment charges related to the Inyx loan, as reflected in the quarterly call reports the Bank has filed with the Federal Deposit Insurance Corporation ("FDIC").  During the fourth quarter of 2007, two of the three pharmaceutical plants that served as part of the collateral for the Inyx loan were sold.  The remaining plant for sale is located in Puerto Rico.  At December 31, 2007, the remaining outstanding principal balance of the Inyx loan was $24.7 million and had a specific allowance of $3.6 million.  The Inyx loan is held in non accrual status.

### W Holding's False Financial Statements

75.     W Holding's issued financial statements were presented in violation of GAAP, including Statement of Financial Accounting Standards ("SFAS") No. 114, and were materially false and misleading due to its improper accounting for impaired assets.

76.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.

77.     Pursuant to SFAS No. 114, a loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement and that a creditor should apply its normal loan review procedures in making the judgment about whether it is probable that it will be unable to collect all amounts due according to the contractual terms of a loan.

78.     The Individual Defendants had the responsibility to select GAAP which were appropriate to reflect W Holding's business activities in accordance with Section 13 of the Exchange Act.  In addition to violating the provisions of SFAS No. 114, W Holding presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(a)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts ("Concepts Statement") No. 1, ¶34);

(b)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(c)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(d)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(e)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(f)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

79.     In failing to file financial statements with the SEC which conformed to the requirements of GAAP, W Holding disseminated financial statements that were presumptively misleading and inaccurate.  The Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties which were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**Additional Scienter Allegations**

80.     As alleged herein, Defendants acted with scienter in that Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding W Holding, their control over, and/or receipt and/or modification of W Holding's allegedly materially misleading misstatements and/or their associations

- 43 -

with the Company which made them privy to confidential proprietary information concerning W Holding, participated in the fraudulent scheme alleged herein.

81. In addition, each of the impaired Inyx loans, beginning in March 2005 with the initial funding of $46 million in loans to Inyx, were reviewed and ratified by Westernbank's Senior Credit Committee, providing further evidence of Defendants' detailed knowledge of the scheme to fraudulently overstate W Holding's earnings and assets by failing to write-down impaired Inyx loans. According to the Company's SEC filings, Westernbank's Senior Credit Committee approval is required for all loans in excess of $20.0 million or $15.0 million in the case of Westernbank Business Credit Division which originated the impaired Inyx loans. The Senior Credit Committee is composed of a majority of the members of the Company's Board of Directors and senior lending officers. Defendants Stipes and Biaggi were members of the Senior Credit Committee throughout 2005 and 2006. By November 2005, loans to Inyx totaled at least $97.5 million, increasing to at least $110 million by September 2006.

82. Each of the Individual Defendants directly benefited from the fraudulent overstatement of the Company's earnings by receiving lucrative performance-based compensation and bonuses. From 2003 through 2006, Stipes reaped more than $4.6 million in bonuses; over that same period Hernandez was paid approximately $1.8 million in bonuses; from 2003 through 2005, Maldonado garnered approximately $2.3 million in bonuses; during 2006, Rivera received a $166,000 bonus; in 2005 and 2006, Biaggi received bonuses of approximately $1.0 million. All of these "bonuses" were paid based on the false "perception" that the Company's reported earnings were fairly stated.

**Loss Causation/Economic Loss**

83. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated W Holding's stock price and

operated as a fraud or deceit on Class Period purchasers of W Holding stock by misrepresenting the Company's business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by misrepresenting the Company's financial statements, earnings and prospects. Later, however, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, W Holding stock fell precipitously as the prior artificial inflation came out of W Holding's stock price. As a result of their purchases of W Holding stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

84.     The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate W Holding's stock price and the subsequent significant decline in the value of W Holding's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

### Applicability of Presumption of Reliance
### Fraud on the Market Doctrine

85.     The markets for W Holding's common stock were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions of material fact, W Holding's publicly traded securities traded at inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired W Holding publicly traded securities relying upon the integrity of the market price of W Holding publicly traded securities and market information relating to W Holding, and have been damaged thereby.

86.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of W Holding's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

87.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about W Holding's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of W Holding and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

88.     At all relevant times, the market for W Holding securities was an efficient market for the following reasons, among others:

(a)     W Holding common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, W Holding filed periodic public reports with the SEC and the NYSE;

(c)     W Holding regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 46 -

(d)     W Holding was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

89.     As a result of the foregoing, the market for W Holding common stock promptly digested current information regarding W Holding from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of W Holding common stock during the Class Period suffered similar injury through their purchase of W Holding common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

90.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors which could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of W Holding who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

91.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

94.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for W Holding common stock.  Lead Plaintiffs and the Class would not have purchased W Holding common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

95.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of W Holding common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

96.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of W Holding within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of W Holding, and their ownership of W Holding stock, the Individual Defendants had the power and authority to cause W Holding to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 28th day of April of 2008.

s/Andrés W. López
_____
ANDRES W. LOPEZ

Andrés W. López, Esq.
USDC No. 215311
THE LAW OFFICES OF ANDRES W. LOPEZ,
   P.S.C.
207 Del Parque Street, Third Floor
San Juan, PR  00912
*Telephone* (787) 641-4541
*Facsimile* (787) 641-4544
E-mail: andreswlopez@yahoo.com

QUETGLAS LAW OFFICES
ERIC M. QUETGLAS JORDAN
USDC-PR #202514
P.O. Box 16606
San Juan, PR  00908-6606
Telephone:  787/722-0635
787/725-3970 (fax)

*Co-Liaison Counsel*

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
RUSSELL J. GUNYAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

WHATLEY, DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
EDITH M. KALLAS
LILI R. SABO
1540 Broadway, 37th Floor
New York, NY  10036
Telephone:  212/447-7070
212/447-7077 (fax)

*Co-Lead Counsel for Plaintiffs*